# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **PAMELA J. BRITTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 2:12cv0064 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the

application of Pamela J. Britton for disability insurance benefits (DIB) under Title II of the

Social Security Act (the Act), 42 U.S.C. § 401-433. For the reasons set forth below, the Court[2]

finds that remand is required.

## Procedural History

Pamela Britton (Plaintiff) applied for DIB in March 2009,[3] alleging she had become

disabled on August 3, 2004, by herniated discs in her back, a hearing loss, and a pinched

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security in February 2013 and is hereby substituted for Michael J. Astrue as defendant. See 42 U.S.C. § 405(g).

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[3]An earlier application alleging a disability onset date of August 3, 2004, was denied on January 29, 2009, following an administrative hearing. On judicial review, the adverse decision of the Commissioner was affirmed. See Britton v. Astrue, No. 2:09cv50 MLM (E.D. Mo. Sept. 24, 2010).

sciatic nerve.  (R.[4] at 143-49, 183.)  Her application was denied initially and following an

August 2010 hearing before Administrative Law Judge (ALJ) Joseph P. Donovan, Sr.  (Id. at

11-23, 39-79, 93.)  The Appeals Council denied Plaintiff's request for review, effectively

adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel; James J. Radke, M.Ed., C.R.C.,[5] and L.P.C.[6]; and

James M. McKenna, M.D., testified at the administrative hearing.

Plaintiff amended her alleged disability onset date to be January 29, 2009, the date of

the previous ALJ's unfavorable decision.[7]  (Id. at 48.)

Plaintiff has an unrestricted driver's license, and last drove the day before.  (Id. at 44-

45.)  She is 5 feet 2½ inches tall and weighs 232 pounds.  (Id. at 49.)  She smokes one pack

of cigarettes a day.  (Id. at 49-50.)

Plaintiff last worked as a security guard.  (Id. at 60.)  This job required that she sit half

the time and stand half the time.  (Id. at 61.)  She worked as a sales clerk for Wal-Mart and as

a finisher at a cloth manufacturer; both jobs primarily required standing.  (Id.)  Her job as a

machine operator for an electronic parts manufacturer primarily involved sitting.  (Id.)

---

[4]References to "R." are to the administrative record filed by the Commissioner with her
answer.

[5]Certified Rehabilitation Counselor.

[6]Licensed Professional Counselor.

[7]See note 3, supra.

Plaintiff testified that she can sit for approximately an hour, stand for no longer than twenty minutes, and walk no farther than fifty feet. (Id. at 57.) She cannot crouch or crawl. (Id.) She can reach out and raise her right arm, but not her left arm. (Id.) The most she can lift is five pounds. (Id. at 58.) She uses a prescribed cane "quite a bit." (Id.) She has had bronchial problems all her life. (Id. at 60.) Exposure to fumes, odors, dusts, and gases causes her problems. (Id. at 61.) Exposure to cigarette smoke also causes her problems, although she smokes a pack a day. (Id. at 61-62.)

Dr. McKenna testified that Plaintiff is considered morbidly obese. (Id. at 49.) He opined that she has smoker's bronchitis. (Id. at 50.) The limitations in her ability to walk are attributable more to her back problems than to her respiratory problem. (Id.) She also has a history of tinnitus and headaches. (Id. at 51.) None of these impairments satisfy a listing, "[e]specially after the curative surgery." (Id. at 51-52.) Her degenerative scoliosis was corrected by surgery. (Id. at 52-53.)

Dr. McKenna further testified that there was "probably a basis" for the residual functional capacity assessment by a physician,[8] see pages 16 to 19, infra, but not for the limitation of three hours for sitting. (Id. at 55-56.) Instead, he thought a sit-stand option was appropriate. (Id. at 63, 64.) Climbing ladders, ropes, or scaffolds; being exposed to unprotected heights; and being on irregular terrain would be precluded. (Id. at 56.) She should only rarely do such things as "chronic stooping." (Id.) Dr. McKenna also disagreed

---

[8]Although the ALJ referred to the assessment as being done by a consulting examiner, there is no indication of the role of the physician, Dr. Halma, who completed the assessment at issue.

with the physician's limitation of Plaintiff's ability to manipulate. (<u>Id.</u> at 67.) He found that limitation to have no support in the record. (<u>Id.</u>) He testified that he could find no basis for other limitations imposed by Plaintiff's primary care physician, see page 20, infra, including a complete prohibition on bending and stooping. (<u>Id.</u>)

Mr. Radke, testifying as a vocational expert (VE), characterized Plaintiff's food preparation job, *Dictionary of Occupational Titles* (DOT) 311.472-020, as light and unskilled with a specific vocational preparation (SVP) level[9] of 2; as a cashier, DOT 211.46-010, as light and unskilled with an SVP of 2; as a gambling attendant, DOT 342.657-010, as light and semi-skilled with an SVP of 3; as a machine operator in an electronics plant, DOT 619.682-062, as medium and semi-skilled with an SVP of 3; and as a postal clerk, DOT 209.687-026, as unskilled with an SVP of 2. (<u>Id.</u> at 70.) With all but the postal clerk position, the exertional level was the same in the DOT definition as it was actually performed. (<u>Id.</u>) The postal clerk position was light as defined in the DOT and medium as performed. (<u>Id.</u>)

Mr. Radke was then asked by the ALJ to assume a hypothetical person who required a sit-stand option at will; who could lift and carry eight pounds frequently and ten pounds occasionally; who could sit, stand, or walk for six hours in an eight-hour day; who could frequently use leg controls, feel, finger, and handle objects; who could not reach overhead with the left arm, but could frequently reach overhead with the right arm; who could frequently

---

[9]"The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

climb ramps and stairs, but never climb ladders, ropes, and scaffolds; who could frequently balance; who could only occasionally stoop; and who could not kneel, crouch, or crawl. (Id. at 70-71.) This person also could remember, understand, and carry out simple, repetitive tasks with attention and concentration for extended periods. (Id. at 71-72.) She could interact appropriately with the public, supervisors, and co-workers, and could respond to changes in the work setting. (Id. at 72.) The time off-task and the loss of productivity would be five percent. (Id.) She should avoid concentrated exposure to noise, height, pitch, frequencies, extreme heat and cold, unprotected heights, and hazardous moving machinery. (Id.) She was approximately forty-seven years old, had a twelfth grade education, and could read, write, and understand English. (Id.) Asked if this hypothetical person could perform Plaintiff's past relevant work, Mr. Radke replied that she could not. (Id.)

She could, however, work as a receptionist, a general office clerk, and an order clerk. (Id. at 73-74.)

Plaintiff's counsel asked Mr. Radke about a hypothetical claimant who needed to be able to leave her work station "for some period of time" in order to walk or lie down to relieve back pain. (Id. at 74-75.) He replied that this requirement, particularly the need to lie down, "would have a significant impact on the available jobs." (Id. at 75.) If this person needed only to walk around within ten to fifteen feet of her station, but was still off-task for only five percent of the time, it would have no impact; however, if the time off-task was twelve to fifteen percent of the time, it would have a "very significant negative impact" on her ability to sustain employment. (Id.) The determining line was ten percent. (Id. at 76.)

If the hypothetical person could not sit for more than a total of three hours at a sedentary job, she would not be employable at the sedentary level. (Id.) Nor would the person be employable at the sedentary level if she could lift no more than five pounds occasionally and no weight frequently. (Id. at 77.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and four assessments of her physical capabilities.

When applying for DIB, Plaintiff completed a Disability Report. (Id. at 182-89.) She was 5 feet 2 inches tall and weighed 230 pounds. (Id. at 182.) Her impairments, see pages one to two, supra, limit her ability to work by causing her constant back pain. (Id. at 183.) She is taking narcotic, addictive pain medication, and is unable to drive. (Id.) She does not sleep well; has limited mobility; has to frequently change positions; and can not lift anything. (Id.) She is depressed because of her health problems. (Id.) These impairments first bothered her in 2003 and caused her to be unable to work on August 3, 2004. (Id.) After trying different jobs, she stopped working on October 18, 2006, because the pain was unbearable. (Id.) She takes Cymbalta for her depression; hydrocodone for pain; and Nexium for stomach problems. (Id. at 187.) She graduated from the twelfth grade, and had not been in special education classes. (Id. at 188.)

Asked to describe on a Function Report what she does during the day, Plaintiff reported that, after getting up, she gets her daughter off to school, takes her medication, and sits on her

bed to put on her clothes. (Id. at 198-205.) Her husband does the cooking. (Id. at 198.) She takes pain pills four times a day. (Id.) She helps her daughter with her homework; her daughter helps her with preparing meals. (Id. at 199.) Before her impairments, Plaintiff was able to mow, lift, plant flowers, and swim. (Id.) Because of constant pain, she gets up in the middle of the night. (Id.) She sits to dress, and does other personal hygiene tasks by herself. (Id.) She sometimes has to be reminded by her husband or daughter whether she has taken her medication. (Id. at 200.) She prepares fast, easy meals. (Id.) She needs help when doing housework. (Id.) When she shops for groceries, she buys only things that are not heavy, e.g., bread or a gallon of milk. (Id. at 201.) The shopping trips are once a week and last only twenty minutes. (Id.) She drives, but not far. (Id.) Her only hobby is watching television. (Id. at 202.) She visits with people over the telephone or when they come to see her. (Id.) Her impairments adversely affect her abilities to lift, squat, bend, stand, walk, sit, kneel, hear, climb stairs, remember, complete tasks, and concentrate. (Id. at 203.) They do not affect her abilities to reach, use her hands, understand, or follow instructions. (Id.) She can not lift more than ten pounds. (Id.) She cannot walk farther than one block before having to stop and rest for thirty minutes. (Id.) She does not get along well with bosses or some teachers. (Id. at 204.) She does not handle stress or changes in routine well. (Id.) She marked the box labeled "Yes" in response to the question whether she had ever been fired or laid off from a job because of problems getting along with other people. (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application. (Id. at 220-26.) Since she had last completed a disability report, she had been told

that her back bones are disappearing and that surgery to replace the bones is needed. (Id. at 220.) She uses a walker. (Id.) Also, she now has fatty tumors on her back that require further surgery. (Id.) In addition to Nexium and Cymbalta, she takes Skelaxin and cyclobenzaprine as muscle relaxants and Darvocet for pain. (Id. at 223.)

In the fifteen years between 1994 and 2009, inclusive, Plaintiff had annual earnings in access of $10,000 in 1995 through 1999, inclusive, and 2003. (Id. at 165.) She had no earnings in 2005, 2007, 2008, and 2009. (Id.)

The relevant medical records[10] before the ALJ are summarized below in chronological order.

On February 1, 2008, Plaintiff saw J. Beckert, D.O., at Kahoka Medical Clinic (Kahoka Clinic), for complaints of a cough, chest congestion, and shortness of breath for the past two days. (Id. at 291.) She was treated with antibiotics. (Id.)

Plaintiff returned to the Kahoka Clinic on February 19 with complaints of abdominal and back pain and migraines. (Id. at 290-91.) She was seen by Brigitte Cormier, D.O. (Id.) Plaintiff suspected that she had a bladder infection. (Id. at 290.) She was in no acute distress. (Id.) A urinary analysis was positive for a urinary tract infection. (Id.) Plaintiff was given antibiotics for the infection and a refill of Vicodin and Cymbalta. (Id. at 290, 291.) Plaintiff was seen three days later by Dr. Beckert, injected with an antibiotic, Rocephin, and prescribed Pyridium, a urinary tract analgesic, and Bactrim. (Id. at 289.)

---

[10]Records before the ALJ but not discussed below include those relating to Plaintiff's infected great right toe, id. at 283-84, bronchitis, id. at 279-80, and sore throat and chest congestion, id. at 344.

Plaintiff saw Dr. Beckert again on March 11 and was referred to a Dr. Storm for consultation and evaluation of her chronic urinary tract infection.  (Id. at 288.)

One week later, she was seen by Dr. Beckert for complaints of abdominal pain in her upper right quadrant.  (Id. at 287.)  She was prescribed Nexium and scheduled for an ultrasound.  (Id.)  The ultrasound, performed the next day at Keokuk Area Hospital, was normal; however, there was diffuse fatty infiltration of her liver.  (Id. at 265-66.)

On April 30, Plaintiff consulted Dr. Cormier for "her chronic and continued back pain," which was getting worse.  (Id. at 286-87.)  The pain was radiating down her leg[11] and was resulting in a "significant decreased range of motion in flexion, extension, side bending and rotation."  (Id. at 286.)  On examination, Plaintiff had a difficult time with her gait, with getting on and off the examining table, and when getting up and out of her chair.  (Id.)  Also, Plaintiff wanted disability paperwork completed.[12]  (Id. at 286, 287.)

Plaintiff consulted Dr. Beckert on July 1 about concerns that she might be diabetic.  (Id. at 285.)  She was informed that she needed to lose sixty to seventy pounds.  (Id.)

Plaintiff had a colonoscopy in August to investigate her complaints of constipation.  (Id. at 267-69, 281-82.)  The colonoscopy was normal; Thomas Hakes, M.D., diagnosed Plaintiff with irritable colon syndrome.  (Id. at 267-69, 281-82.)

In October, Plaintiff returned to Dr. Beckert, complaining of worsening low back pain that radiated down her right hip and leg.  (Id. at 280, 283.)  Because of the pain, she could not

---

[11]Which leg was not specified.

[12]See note 3, supra.

sit, stand, or lie down for long.  (Id. at 283.)  She reported that the pain had begun in 2004 when she injured her back working at a casino and was continually lifting heavy bags of quarters.  (Id.)  She had contacted an attorney.  (Id.)  She insisted on having a magnetic resonance imaging (MRI) of her spine.  (Id. at 280.)  That MRI, performed the next day at Keokuk Area Hospital, revealed (1) moderate L5-S1 disc degeneration with a broad-based high signal intensity posterior annular fissure and a laminotomy defect on the left; (2) a mild subarticular recess stenosis and facet arthropathy on the left with mild encroachment on the traversing left S1 nerve root; (3) mild L4-L5 disc and facet degeneration; and (4) mild to moderate disc degeneration at L2-L3, L1-L2, and T12-L1.  (Id. at 270-73, 276-78, 311-13.)

The next month, after again consulting Dr. Beckert, Plaintiff was to have a consultation with another doctor for an evaluation of her severe back pain.  (Id. at 275.)  Her primary concern at that visit was her urinary tract problems.  (Id.)  She was to be seen for routine follow-up care.  (Id.)

The next record is from May 19, 2009, when Plaintiff saw Dr. Beckert about her back pain and was given a referral to Dr. Highland.  (Id. at 346.)

In June, Plaintiff complained to Dr. Beckert of severe pain in her back and hip.  (Id. at 347.)  Concluding that the hydrocodone was not sufficiently alleviating Plaintiff's pain, he changed her prescription to Percocet.  (Id.)

Plaintiff consulted Thomas R. Highland, M.D., on July 13, reporting severe back pain that radiated down her left leg to the back of the knee and her right leg down to her foot.  (Id. at 303.)  She further reported that she had had the pain for four years.  (Id.)  She could barely

walk, and had trouble getting off the examination table. (Id.) X-rays of her lumbar spine revealed "[s]ignificant narrowing at L4-L5 and L5-S1 with mild scoliosis." (Id. at 303, 310) An MRI was recommended. (Id. at 303.)

Two days later, Dr. Highland informed Plaintiff of the MRI results and recommended an anterior fusion at L4-L5 and L5-S1 with a laminectomy. (Id. at 302.) Plaintiff agreed. (Id.)

Plaintiff saw Dr. Cormier on August 11 about pain in her upper thoracic spine and pain and numbness in her fingers. (Id. at 348.) She was also concerned about a recurring cyst. (Id. at 348.) Plaintiff was encouraged to speak with Dr. Highland about having the cyst removed during the fusion surgery. (Id.) Dr. Cormier declined to increase Plaintiff's Percocet dosage. (Id.)

Six days later, Plaintiff underwent a consultation examination by Robin B. Blount, M.D., prior to undergoing the surgery. (Id. at 337-39.) Plaintiff informed him that she could not work due to her back pain and had been denied disability. (Id. at 337.) Dr. Blount described her as "really quite upset, and the entire time she is in [the] office does not want to answer questions, is evasive, and states that she has already told to [sic] many people the same questions, and just is not interested in cooperating much with this evaluation." (Id.) She reported that she had been treated for depression, but the medication, Cymbalta, made her sick and she had not been taking it for the past few days. (Id.) She attributed her back pain to all the lifting she had had to do in her previous jobs. (Id.) An electrocardiogram (EKG) was normal. (Id. at 338.) Her extremities were not swollen. (Id.) Dr. Blount agreed with the planned surgery. (Id. at 339.)

Plaintiff was admitted to Boone Regional Hospital on August 26 for anterior fusion surgery. (Id. at 305-09, 317-40.) Her medical history on admission included gastroesophageal reflux disease (GERD) since 2006, treated with Nexium; history of depression, treated with Cymbalta; history of seasonal bronchial asthma and acute bronchitis, treated with an inhaler as needed; and a history of spastic colitis. (Id. at 325.) It was noted that she had been a cigarette smoker for years. (Id.) It was also noted that she reported that she had been in "fair medical health" for the past forty-six years. (Id.) "None" was listed for "serious diseases." (Id. at 326.) She had had a partial laminectomy with diskectomy at the L5-S1 level on the left side in 1998, returned to work, and was doing well until 2004 when she had acute low back pain while filling hoppers of slot machines at the casino where she worked. (Id. at 323.) She was "eventually fired from that job." (Id.) She has "basically . . . lived with her symptoms since that time." (Id.) Her current medications included Nexium, Percocet, Vicodin, Cymbalta, and cyclobenzaprine to be taken regularly and Diphen/atrop to be taken as needed. (Id. at 326.) Dr. Highland noted that Plaintiff had tinnitus in both ears and alternating diarrhea and constipation from her spastic colitis. (Id. at 326.) Plaintiff was discharged on August 30 with instructions "to continue with a course of . . . progressive ambulation," do no bending or twisting at the waist, and lift nothing heavier than eight to ten pounds. (Id. at 321.) There were no sitting limitations. (Id.)

Plaintiff consulted Dr. Cormier on September 16, reporting that she was not doing well after her surgery. (Id. at 349-51.) She was having difficulties getting around, including getting up out of chair, and was having right leg pain. (Id. at 351.) She was taking Percocet, which

was "helping some."  (Id.)  Her prescriptions for Percocet and the other medications were renewed.  (Id.)

Seven weeks after her surgery, on October 13, Plaintiff again saw Dr. Highland.  He reported that x-rays of her lumbar spine revealed "[g]ood initial healing of anterior fusion at L4-5 and L5-S1.  (Id. at 301.)  He informed Plaintiff that "her x-rays looked great" and that, at the site of her fusion, "everything looks good there."[13]  (Id.)  She informed him that she still had pain, particularly in her right leg, and had swelling in her left leg.  (Id.)  She had been walking until two days earlier when she experienced a sudden onset of swelling in her left leg, thigh, and calf.  (Id.)  She was walking "okay," although it caused pain in her back and right leg.  (Id.)  Dr. Highland encouraged her to walk and told her he thought her back and right leg would improve when she could get back to walking.  (Id.)  He noted that the ultrasound performed by Dr. Beckert for deep vein thrombosis (DVT) was negative, but scheduled Plaintiff for another ultrasound to make sure there was no DVT.  (Id.)  That ultrasound also was negative.  (Id. at 304.)

Three days later, Plaintiff saw Dr. Beckert, complaining of "marked" pain, discomfort, and swelling in her left lower extremities.  (Id. at 353.)  Dr. Beckert noted that Plaintiff was on narcotics for pain relief and that Dr. Highland did not agree with his approach.  (Id.)  He cautioned Plaintiff to try not to take the narcotics any more than necessary.  (Id.)  Her prescriptions, including one for hydrocodone, were renewed the next month.  (Id.)

--------

[13]The ALJ mistakenly refers to this observation being that of Dr. Beckert.

Plaintiff consulted Dr. Cormier in January 2010 for intermittent right lower quadrant pain. (<u>Id.</u> at 354.)  Dr. Cormier attributed the pain to a flare-up of Plaintiff's diverticular disease and prescribed some medication to help regulate her stools.  (<u>Id.</u>)

In March, Plaintiff was treated by Dr. Cormier for a cough and congestion unrelieved by over-the-counter medication. (<u>Id.</u> at 355.) As before, she was treated with antibiotics. (<u>Id.</u>)

Plaintiff saw Dr. Cormier again in May for "numerous" complaints, including pain in her left shoulder and arm, weakness in her ankles, and a yeast infection.  (<u>Id.</u> at 356-57.)  She was concerned that a lipoma (a benign fatty tumor) that had been removed earlier was growing back.  (<u>Id.</u> at 356.)  She was scheduled to see Dr. Highland, who had performed the removal, in June.  (<u>Id.</u> at 356.)  She was to return to the clinic as needed.  (<u>Id.</u>)

Plaintiff returned in July, seeing Dr. Beckert for complaints of severe pain and discomfort in her right leg and for completion of disability paperwork.[14] (<u>Id.</u> at 343, 358.) She informed him that Dr. Highland had cancelled her appointment. (<u>Id.</u>)  On examination, she was unable to squat or bend over and touch the floor.  (<u>Id.</u>)  She walked with a cane.  (<u>Id.</u>)  Dr. Beckert opined that she was "unemployable" due to her severe pain.  (<u>Id.</u>)  He did not anticipate that the pain would improve.  (<u>Id.</u>)  Plaintiff was continued on her current regimen. (<u>Id.</u>)

Plaintiff saw Dr. Highland in August.  (<u>Id.</u> at 366.)  She had pain in her neck, left arm, and upper back and residual pain in her low back and right leg.  (<u>Id.</u> at 366.)  He noted that she had had "a couple of significant falls" since he had last seen her and that the falls had led to

---

[14]<u>See</u> page 20, infra.

the pain in her neck, left arm, and upper back. (Id.) She was also "having progressive deformity and pain in her feet." (Id.) X-rays of her cervical spine revealed "significant facet arthritic changes"; of her thoracic spine revealed "[m]ultiple level degenerative disc disease"; and of her lumbar spine revealed the healed anterior fusion at L4-L5 and L5-S1 "with some signs of degeneration." (Id.) Dr. Highland recommended new MRI scans and an evaluation of her feet by a podiatrist. (Id.) The MRI of her cervical spine revealed facet arthropathy on the left with neural foraminal narrowing at C4-C5 and broad-based central disc protrusion at C6-C7 with right neural foraminal disc protrusion. (Id. at 368.) The MRI of her thoracic spine revealed anterior spondylosis without focal disc protrusion, but no acute compression fracture or edema. (Id. at 367.) The MRI of her lumbar spine revealed, in addition to the anterior fusion at L4-L5, lumbar spondylosis and a disc bulge with facet arthropathy and lateral recess/subarticular encroachment that was most noticeable at L3-L4. (Id. at 369.)

Dr. Highland examined and x-rayed Plaintiff's feet on September 16. (Id. at 364-65.) His impression was of bilateral foot pain; posterior tibial tendon dysfunction; bilateral accessory naviculars (an accessory bone of the foot); acquired pes planus (flat feet); and gastroc contracture. (Id. at 365.) He recommended she wear an ankle brace when she is active, wear orthotic shoes, and take an anti-inflammatory. (Id.) He started her on Naproxen and recommended physical therapy. (Id.) She was to be re-evaluated after these measures had been given a try. (Id.)

Dr. Highland spoke with Plaintiff over the telephone on October 4 about the MRI results. (Id. at 363.) He suspected that the arthritic changes in her cervical spine were causing

her arm pain.  (Id.)  She asked if they could be causing her headaches; he did not know, but thought it possible.  (Id.)  He recommended an epidural steroid injection at C6-C7. (Id.) Plaintiff mentioned that she was trying to get disability.  (Id.)

Also before the ALJ were various assessments of Plaintiff's impairments and their resulting limitations.

In September 2008, Plaintiff was evaluated by Kelly David Halma, D.O.  (Id. at 251-64.) Plaintiff described the onset of her low back pain as beginning in 2003 and being work-related. (Id. at 251.)  The pain radiated to her right lower extremity pain.  (Id.)  She also had numbness down her right leg, intermittent muscle spasms in her low back, and pain in her left leg down to her knee.  (Id.)  The pain was then a six on a ten-point scale.  (Id.)  At its worst it was an eight; at its best a five.  (Id.)  An acceptable level was a four.  (Id.)  Vicodin and rest relieved her pain.  (Id.)  Lying on her side or back, extreme cold, getting out of the car, and prolonged walking, standing, sitting, and riding aggravated the pain.  (Id.)  Plaintiff had migraine headaches once a week, and had had for two years.  (Id.)  She also had ringing in her ears, which was worsening over time.  (Id.)  She could walk a block, lift fifteen pounds in either hand, ride for sixty minutes, stand for fifteen to thirty minutes, and sit for thirty to forty-five minutes.  (Id. at 251-52.)  She drove two to three times a week, and did not have a handicap sticker.  (Id. at 252.)  Other medical problems included depression, bilateral hip pain, sinus or allergy problems, GERD, obesity,[15] carpal tunnel, arthritis, and bilateral knee pain.  (Id.)  She

---

[15]With a height of 5 feet 2½ inches and a weight of 222 pounds, Plaintiff had a Body Mass Index (BMI) of 40.  (Id. at 253.)  The Court notes that Plaintiff testified that her current weight was 232, resulting in a BMI of 42.  (Id. at 49.)

- 16 -

smoked one pack of cigarettes a day, and had done so for fifteen years. (Id.) She had ringing in the ears bilaterally, a daily cough, shortness of breath at rest, and recurrent urinary and bladder infections. (Id.) Her recent and remote memory of medical events was good to fair, although she had some difficulty recalling facts and dates. (Id. at 253.) She was alert and oriented and did not appear to be in acute distress. (Id.) She rocked from side to side to try to relieve her pain and appeared to be uncomfortable after sitting fifteen minutes. (Id.) She was unable to stand erect, flexing approximately fifteen degrees. (Id.) She needed to use both hands to get out of her chair. (Id.) She only took six steps when tandem walking, and had difficulty walking heel to toe. (Id.) She could lift her left leg greater than ninety degrees, and her right left up to ninety degrees. (Id.) She refused to kneel for fear of falling and increased pain. (Id.) She was slow when going up and down an eight-inch step. (Id.) She was able to understand a conversational voice, but Dr. Halma's voice had to be slightly louder and she spoke slightly louder. (Id.) Her fine motor skills and coordination were intact. (Id.) She had decreased sensation to touch in her lower extremities along the right lateral thigh. (Id.) She could place her hands behind her head, but had difficulty reaching behind her back. (Id.) She had a positive Tinel's sign at the left elbow and at both wrists and a negative Phalen's sign.[16] (Id. at 254.) Finkelstein's test was slightly positive on the right.[17] (Id.) She had pain over the

---

[16]Tinel's and Phalen's tests are used in the diagnosis of carpal tunnel syndrome. See Jonathan Cluett, M.D., Carpal Tunnel Syndrome http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel (last visited September 12, 2013). A Tinel's sign is present when tingling in the fingers is made worse by tapping the median nerve along its course in the wrist. Id. A Phalen's sign is present when pushing the back of the hands together causes the complained-of symptoms. Id.

[17]The Finkelstein test is used to confirm whether a patient has de Quervain's tenosynovitis. De Quervain's tenosynovitis, http://www.mayoclinic.com/health/medical/IM00780 (last visited

lateral epicondyle region of her right elbow. (Id.) In her hips, she had decreased strength, flexion, extension, and internal rotation. (Id.) Seated straight leg raises were positive.[18] (Id.) She had deceased strength in her knees and flexion on the right was four out of five. (Id.) A grind test was positive for pain at the right knee. (Id.) She appeared to be uncomfortable in a prone position after ten minutes. (Id.) She had a limited range of motion in her cervical and lumbar spine. (Id. at 254, 257.) She could not raise an eight and one-half pound box higher than one to two inches or pick up an object off the floor without experiencing pain that was a seven to eight on a ten-point scale. (Id. at 255.) Dr. Halma's assessment was of low back pain secondary to degenerative disc disease with a positive history of L5-S1 involvement; right knee pain and possible degenerative joint disease; muscle spasms in both hamstrings; morbid obesity; and a history of carpal tunnel syndrome, greater on the right than on the left. (Id.)

Dr. Halma also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) after examining Plaintiff. (Id. at 259-64.) He was unable to assess Plaintiff's ability to lift and carry weight due to her low back pain. (Id. at 259.) At any one time and without interruption, she could sit, stand, or walk for no longer than thirty minutes. (Id. at 260.) For a total during an eight-hour work day, she could sit for three hours and stand or walk for two. (Id.) She did not need to use a cane to walk. (Id.) She was limited to only

_____

September 12, 2013). The test is positive when pain is caused when the patient bends her thumb down across the palm of the hand, covers the thumb with her fingers, and then bends her wrist toward her little finger. Id.

[18]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

occasionally pushing or pulling with either hand.  (Id. at 261.)  She was also limited to frequently reaching overhead and handling with either hand.  (Id.)  She could continuously finger, feel, and do all other reaching.  (Id.)  She should use her feet to operate foot controls no more than two-thirds of the time.  (Id.)  She should never crouch, crawl, or climb ladders or scaffolds and should only occasionally kneel, stoop, balance, or climb stairs and ramps.  (Id. at 262.)  She should only occasionally be exposed to humidity and extreme cold or heat.  (Id. at 263.)  She should never be around unprotected heights and vibrations.  (Id.)  She could not climb a few steps at a reasonable pace even when using a single hand rail.  (Id. at 264.)  She could care for her personal hygiene, prepare a simple meal, shop, travel alone, and sort, handle, and use paper and files.  (Id.)

In October 2009, Dr. Highland completed a form titled "Medical statement regarding low back pain for Social Security disability claim."  (Id. at 298-99.)  Of a list of symptoms, he checked as present neuro-anatomic distribution of pain, limitation of motion of spine, and sensory or reflex loss.  (Id. at 298.)  He did not check, among others, an "[i]nability to ambulate effectively" or "[n]eed to change position more than once every two hours."  (Id.)  He circled "moderate" as the level of pain that Plaintiff suffered from, sixty minutes as the length of time she could stand or sit at one time, ten pounds as the weight she could lift on an occasional basis and five pounds as the weight she could frequently lift, "[o]ccasionally" for how often she could bend, and "[n]ever" for how often she could stoop.  (Id.)  He noted that she could not work.  (Id.)  In the "Comments" section, he also noted that she was recovering from recent back surgery.  (Id. at 299.)

In July 2010, Dr. Beckert completed a different "Medical statement regarding low back pain for Social Security disability claim" form on behalf of Plaintiff.  (<u>Id.</u> at 341-43.)  His diagnoses were degenerative joint disease, spinal stenosis, bulging disc, and degenerative scoliosis.  (<u>Id.</u> at 341.)  All were in the lumbar spine.  (<u>Id.</u>)  He circled fifteen minutes for the length of time Plaintiff could stand at one time and sixty minutes for the total amount of time during a work day that she could stand or sit.  (<u>Id.</u>)  She could sit for sixty minutes at any one time.  (<u>Id.</u>)  She could lift five pounds occasionally.  (<u>Id.</u>)  She could never bend, stoop, work around dangerous equipment, or tolerate extreme heat, dust, smoke, or fumes.  (<u>Id.</u>)  She could occasionally balance, operate a motor vehicle, tolerate extreme cold, tolerate exposure to noise, and do fine or gross manipulation with her left hand.  (<u>Id.</u>)  She could frequently do fine or gross manipulation with her right hand.  (<u>Id.</u>)  She would need to elevate her legs most of the time during an eight-hour workday. (<u>Id.</u> at 342.)  Dr. Beckert opined that Plaintiff's level of pain was severe.  (<u>Id.</u>)

The next month, Dr. Highland completed the same "Medical statement regarding low back pain for Social Security disability claim" form as had Dr. Beckert.  (<u>Id.</u> at 361-62.)  His diagnoses were degenerative joint disease of the cervical and lumbar spine, lumbar stenosis, and status-post lumbar fusion.  (<u>Id.</u> at 361.)  He marked that Plaintiff could work two hours a day; stand or sit for thirty minutes at any one time; stand for a total of four hours in a workday; sit for a total of two hours in a workday; occasionally lift ten pounds and frequently lift none; never stoop; occasionally bend, balance, raise her left and right arms above shoulder level; operate a motor vehicle; tolerate heat or cold; and tolerate noise.  (<u>Id.</u>)  She could never work

around dangerous equipment or tolerate exposure to dust, fumes, or smoke. (Id.) She could constantly do fine or gross manipulation with either hand. (Id.) She would never need to elevate her legs during an eight-hour workday. (Id. at 362.) The level of her pain was "moderate." (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had met the insured status requirements of the Act through September 30, 2010, and had not engaged in substantial gainful activity during the period from her amended alleged disability onset date of January 29, 2009, through September 30, 2010. (Id. at 16.) The ALJ next found that Plaintiff had severe impairments of degenerative disc disease, lumbar stenosis, status-post lumbar fusion, and morbid obesity. (Id.) She did not have, however, an impairment or combination thereof that met or medically equaled an impairment of listing-levels severity. (Id.) In so finding, the ALJ considered the effect of Plaintiff's obesity on her impairments. (Id. at 17.)

The ALJ then concluded that Plaintiff had the residual functional capacity (RFC), through the date last insured, to perform sedentary work[19] except she was restricted to lifting and carrying no more than ten pounds occasionally and eight pounds frequently; never climbing ladders, ropes, and scaffolds; never kneeling, crouching, or crawling; never reaching overhead with her right arm; and avoiding concentrated exposure to noise, high-pitched

---

[19]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

frequencies, extreme cold and heat, and unprotected heights and hazardous machinery. (Id.) Also, she needed an at-will sit-stand option. (Id.)

When assessing Plaintiff's RFC, the ALJ considered the medical and opinion evidence of Drs. Cormier, Highland, Beckert, Blount, and McKenna. (Id. at 17-20.) He gave some weight to the treating records of Drs. Beckert, Cormier, and Highland, but gave little weight to the medical source statements of Drs. Beckert and Highland on the grounds that they relieved heavily on Plaintiff's subjective reports of her symptoms and limitations and that they were inconsistent with each other's statement. (Id. at 20-21.) He gave great weight to the opinion of Dr. McKenna, noting that he had the benefit of reviewing all the medical evidence and of hearing Plaintiff's testimony. (Id. at 20.)

The ALJ also considered Plaintiff's activities of daily living and evaluated her credibility, finding her to be only partially credible. (Id.) He noted that she had worked steadily in the past – a consideration favoring her credibility – but had been fired from her job at a casino for reasons apparently unrelated to her impairments. (Id.) Undergoing surgery suggested her symptoms were genuine; however, her physician later noted that things looked good after the surgery. (Id.) Dr. McKenna testified that the surgery should have been curative. (Id.) When seeking medical treatment, Plaintiff sometimes complained only of non-back pain related symptoms, suggesting that the pain was intermittent. (Id.) And, there were indications in the record that her treating physicians were uncomfortable with the dosage of narcotic medications prescribed. (Id.)

With her RFC, however, Plaintiff was unable to perform her past relevant work.  (<u>Id.</u> at 21.)  With her RFC, age as of the date last insured, and education, she was able to perform jobs that exist in significant numbers in the national and local economies.  (<u>Id.</u> at 21-22.)  Additionally, the ALJ found that the vocational expert had reasonably explained any discrepancies between his testimony and the DOT.  (<u>Id.</u> at 22.)

For the foregoing reasons, Plaintiff was found not to be disabled during the relevant period within the meaning of the Act.  (<u>Id.</u>)

### Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).  Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue** , 621 F.3d 734, 738 (8th

Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records,

- 24 -

observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887); <u>accord</u> **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines "'whether a claimant's impairments keep her from doing past relevant work.'" **Wagner**, 499 F.3d at 853 (quoting <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996)). If "the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." **Lowe v. Apfel**, 226 F.3d 969, 973 (8th Cir. 2000).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to her past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court

may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).

## Discussion

Plaintiff argues that the ALJ erred in not accepting the opinions of Drs. Highland and Beckert about her functional limitations; in evaluating her credibility; in failing to include limitations in his RFC findings that were supported by the medical record; and in failing to cite the VE's testimony that such limitations would preclude employment.

Drs. Highland and Beckert were Plaintiff's treating physicians. The ALJ declined to give either physician's assessment of Plaintiff's functional limitations controlling weight and deferred instead to Dr. McKenna's assessment.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); <u>accord</u> **Anderson v. Astrue**, 696 F.3d 790, 793 (8th Cir. 2012); **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011). "However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical

evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" **Anderson**, 696 F.3d at 793 (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir.2010)) (alteration in original).  "Ultimately, the ALJ must 'give good reasons' to explain the weight given the treating physician's opinion." **Id.** (quoting 20 C.F.R. § 404.1527(c)(2)).

There might be such good reasons in the instant case; however, the reasons cited by the ALJ do not lend the necessary support.  For instance, Dr. McKenna replied "Yes" to the ALJ's question whether Plaintiff was "still post-op and recovering." (R. at 63.)  The hearing was one year and one day after her surgery.  When explaining why he discounted the three-hour sitting limitation placed on Plaintiff by Dr. Halma, he stated that surgeons would usually not release their patients for "working except [INAUDIBLE] sedentary activities" before six months or a year after the surgery.[20]  Dr. Highland issued his second medical statement one year and two days after the surgery, limiting Plaintiff to a total of two hours sitting and four hours standing. Dr. McKenna did not have that statement.  Dr. McKenna also attributed the limitations in Plaintiff's ability to walk to her back problems and noted a reference in the October 2009 medical records to Plaintiff walking "okay." (R. at 52, 301.)  That reference used the past tense to describe how Plaintiff was walking and was made in the context of her explanation that she had been walking "pretty good" until she developed acute swelling in her left leg.  Moreover, Dr. McKenna did not have the medical records of a month after the hearing relating to

---

[20]The Court notes that the assessment by Dr. Halma was done the year before Plaintiff's fusion surgery.

Plaintiff's bilateral foot pain and the recommendation that she wear an ankle brace and orthotic shoes. The ALJ had those records before he issued his decision.[21] There is no discussion, however, about how that foot pain might affect Plaintiff's ability to walk.

One consideration of the ALJ when deciding not to give the opinions of Drs. Beckert and Highland great weight was their reliance on Plaintiff's subjective complaints. The ALJ found those complaints not to be fully credible.

As noted above, when evaluating a claimant's credibility, the ALJ must consider the relevant factors: "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011). "'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2008)); accord **Buckner**, 646 F.3d at 558. Additionally, although "ALJs "must acknowledge and consider [the] . . . [relevant] factors before discounting a claimant's subjective complaints, . . . ALJs 'need not explicitly discuss each . . . factor.'" **Wildman**, 596 F.3d at 968 (quoting Goff, 421 F.3d at 791); accord **Buckner**, 646 F.3d at 559; **Lowe**, 226 F.3d at 971-72.

---

[21]Also, the records are dated before the date Plaintiff was last insured.

The Commissioner argues that, when assessing Plaintiff's credibility, the ALJ properly considered the lack of objective evidence supporting her claims of total disability; the medical opinions suggesting she was able to perform sedentary work; "some" of her daily activities; and her failure to comply with treatment. These are proper considerations in general, but are not supported by the record in this case.

The objective medical evidence cited is Dr. McKenna's hearing testimony that Plaintiff's back fusion surgery should have cured her symptoms. Whether it should have, the question is whether it did. In support of his contention that it did, he cites the reference in the post-operative medical records to Plaintiff "walking okay." (Def.'s Br. at 8, ECF No 19.) As noted above, however, this reference is in the past tense. The Commissioner also cites the reference in that same medical record to Plaintiff having recovered well from her surgery. The reference was in the context of the fusion site and the alignment of the implants and spaces looking "good." (R. at 301.) That same record includes Plaintiff's complaint of continuing pain, particularly in her right leg. (Id.) The month earlier, and a month after her surgery, Plaintiff complained to Dr. Cormier of difficulty getting around and right leg pain.

The daily activities cited by the Commissioner in support of the ALJ's credibility determination are washing dishes, folding laundry, preparing meals, shopping, and driving a car without restrictions. Plaintiff reported that her daughter helps her prepare meals, she shops once a week only for light items and for no longer than twenty minutes at a time, and she needs help with housework. She does not drive far. "Although [a]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility, [the Eighth

Circuit Court of Appeals] has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." **Reed v. Barnhart**, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotations omitted) (first alteration in original). In **Kelley v. Callahan**, 133 F.3d 583, 588-89 (8th Cir. 1998), a claimant's testimony that she could take care of her daily needs but required help with housework and shopping supported her credibility. In **Swope v. Barnhart**, 436 F.3d 1023, 1024, 1026 n.4 (8th Cir. 2006), a claimant's daily activities of doing dishes, shopping, carrying groceries into the house, driving a car, mowing the lawn, and fishing were held not to be a reason for discrediting his complaints of disabling pain.

The only reference to Plaintiff not complying with treatment was when she informed Dr. Blount that she had not taken Cymbalta, prescribed for her depression, for a few days because it made her sick.

Other considerations cited by the ALJ do not support his credibility determination. One of those considerations was his finding that she had been fired from her job at a casino for reasons apparently unrelated to her impairments.[22] She might have been, but the record does not say so. She reported that she had been fired or laid-off from a job because she could not get along with people and that she did not get along with bosses. The reference to her being fired from the casino, however, followed her report to Dr. Highland that she had a recurrence

_____

[22]The ALJ found that being fired negated the positive consideration of Plaintiff's good work history. See **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (claimant's work history is a consideration in evaluating a claimant's credibility); **Nunn v. Heckler**, 732 F.2d 645, 648 (8th Cir. 1984) ("[A] claimant with a good record is entitled to substantial credibility when claiming an inability to work because of a disability.") (internal quotations omitted).

of back pain when working at a casino and had been fired. Thus, her impairments could have been the reason she was fired, but the question was never asked.

The ALJ cancelled out the suggestion that her symptoms were genuine by noting the later notation that things looked good after the surgery. For the reasons set forth above, this observation and that of Dr. McKenna that the surgery should have curative do not carry the weight he gave them. The ALJ also weighed the references in Plaintiff's medical records to the dosage of narcotic medications against her credibility. Dr. Cormier declined to increase Plaintiff's dosage of Percocet when seeing her two weeks before her fusion surgery; two weeks after the surgery, Dr. Cormier renewed Plaintiff's prescription for Percocet. Two months after the surgery, Dr. Beckert noted that Plaintiff was taking narcotic medication for pain relief and that Dr. Highland did not agree with the approach. Neither reference includes any implication that Plaintiff had drug-seeking behavior.

The ALJ also noted that, although Plaintiff aggressively sought medical treatment for her pain, see **Kelley**, 133 F.3d at 589 (claimant's numerous visits to doctors supported her allegations of disabling pain), there were times when she sought medical treatment and did not complain of such. This consideration also fails to support his credibility determination. When Plaintiff did mention her pain, it was in the context of the pain being continuing or chronic. Not mentioning it when she was seeking treatment for an infected toe, for instance, is not inconsistent with her descriptions of continuing pain.[23]

---

[23]There are inconsistencies in the record, e.g., Plaintiff reported that she did not drive when applying for DIB and SSI but testified that she did; however, these inconsistencies are not cited by the ALJ and the Court will not assume they were considered in light of the specific considerations that were listed by the ALJ.

## Conclusion

Plaintiff may not have been disabled prior to the date she was last insured; however, the ALJ's reliance on Dr. McKenna's opinion and the ALJ's credibility assessment lack support in the record. The case will be remanded for further proceedings, including a reassessment of Plaintiff's credibility and a reexamination of all the medical evidence. Because the case will be remanded, the Court declines to reach the merits of Plaintiff's last two arguments, both of which focus on the medical assessments of her functional limitations.

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  23rd  day of September, 2013.